1                    UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF OKLAHOMA

3 UNITED STATES OF AMERICA,      )

4                  Plaintiff,      )

5 VS.                    )     NO. 20-CR-78-RAW

6                         )

7 PATRICK DWAYNE MURPHY,      )

8

9

10             SENTENCING HEARING PROCEEDINGS

11        BEFORE THE HONORABLE RONALD A. WHITE

12           UNITED STATES DISTRICT JUDGE

13                MAY 10, 2022

14

15

16 <u>A P P E A R A N C E S:</u>

17 <u>FOR THE PLAINTIFF:</u>  MR. JARROD LEAMAN, U.S. Attorney (OKED)

18 520 Denison Avenue, Muskogee, Oklahoma 74401

19

20 <u>FOR THE DEFENDANT</u>:  MR. DAVID B. AUTRY, Attorney at Law

21 1021 NW 16th Street, Oklahoma City, Oklahoma 73106

22

23 COURT REPORTER:          KARLA McWHORTER CSR-RPR

24                      UNITED STATES COURT REPORTER

25

1        <u>COURT IN SESSION</u>

2              (1:16 p.m.)

3        THE COURT:   Okay.  We are on the record in CR-20-78,

4   United States of America versus Patrick Dwayne Murphy.

5        Mr. Jarrod Leaman is present for the government.  Mr. David

6   Autry is present for the Defendant, and the Defendant is present in

7   the courtroom.

8        This matter comes on today for sentencing.  Before we start

9   on the procedural part, Mr. Leaman, are there victims present?

10  Have they been notified?

11       MR. LEAMAN:  Yes, to both, Your Honor.

12       THE COURT:  And I understand they don't want to speak

13  themselves, but you have statements to read on their behalf?

14       MR. LEAMAN:  That's right, Your Honor.

15       THE COURT:  We will do that as we go.  Okay?

16       MR. LEAMAN:  Yes, sir.

17       THE COURT:  When I ask you if there is anything further

18  from the government in aggravation or mitigation, that's your cue.

19       MR. LEAMAN:  Yes, sir.

20       THE COURT:  Okay, all right.  As I mentioned, this matter

21  comes on today for sentencing.  Has the government received a copy

22  of the Presentence Report?

23       MR. LEAMAN:  Yes, Your Honor, we have, and no

24  objections.

25       THE COURT:  Thank you.  Mr. Autry, you've reviewed

1    the report with your client?

2         MR. AUTRY:  Yes, Your Honor, we have, and we did file

3    various objections and comments.

4         THE COURT:  And I am ready for you to address those

5    at this time.

6         MR. AUTRY:  Thank you, Your Honor.

7    Your Honor, although not strictly relevant to the guideline range

8    or the statutory punishment, we did object on a factual basis to

9    Paragraphs 12 and 15.  It relates to statements from Patsy Jacobs.

10        Paragraph 12 indicates that two days before the homicide of

11   George Jacobs, Mr. Murphy supposedly threatened to kill George

12   Jacobs, and his children.  That was on the 26th of August 1999.

13   The homicide was committed on August 28th or August 29th, 1999.

14   And also, there was testimony and statements made by Ms. Jacobs

15   to the authorities that after George Jacobs was killed, Mr. Murphy

16   supposedly told her that he had cut off Mr. Jacobs' genitals -- not in

17   that language of course -- but that he had done that and if the

18   boys have done the job right, he is dead, referring to Kevin King,

19   I guess, and the other gentleman.

20        We object to that because the Presentence Report basically

21   relies on the investigative materials to make those statements in

22   the report, overlooking that, of course, there was a trial in this case.

23   Ms. Jacobs testified -- to my recollection, she did testify that

24   Mr. Murphy made those statements.  Mr. Murphy testified and

25   denied making those statements.

1    In Count 1, the jury found Mr. Murphy not guilty of First Degree

2 Premeditated Murder and instead convicted him of Second Degree

3 Murder.

4    Ms. Patsy Jacobs' statements reflect, if they were believed,

5 a premeditated design to effect death and an intentional,

6 premeditated killing.  The jury rejected that as a verdict in this case

7 as to Count 1.  So we think that our objection to that is good based

8 on the trial testimony and based on the verdict rendered by the

9 jury.

10    As to Paragraphs 26, 27, 32, and 35, we agree with the

11 Probation Office that the three counts of conviction in this case,

12 the lesser included on Count 1, Count 2, and Count 3, which are

13 kidnapping counts, should be proved for purposes of sentencing

14 and should run concurrently because all of this arose out of a

15 single incident.

16    Now, one way or the main way, I guess, we disagree with the

17 Probation Office's conclusions as to what the sentence in this case

18 should be, and, also the government's arguments, is we believe

19 that the Court is empowered to impose a downward departure

20 not only as to Count 1, Second Degree Murder, but also to

21 Counts 2 and 3, which are felony murder with the underlying felony

22 being kidnapping.  And we cite, Your Honor, Section 2A1.1 of

23 the guidelines, which is the murder guideline and the application

24 notes to it.  The application note states that when there is a

25 premeditated intentional killing, then a life sentence would be

1    appropriate.  However, where there is a felony murder conviction,

2    as was the case here on Counts 2 and 3, the Court is empowered

3    to impose a downward departure if there is a lack of design to

4    affect death.  And we certainly think that's the case here as

5    reflected by the jury's verdict on Count 1.

6         The government indicates that Counts 2 and 3 call for a

7    mandatory term of life imprisonment and that is the minimum

8    mandatory sentence that could be imposed under the statute.

9    They cite this LeFleur case of the 9th Circuit, the Sands case out

10   of the 10th Circuit, and the Rodriguez case from the 1st Circuit

11   saying that a statutory punishment for what amounts to First

12   Degree Murder in Counts 2 and 3 overrides anything the

13   guidelines say.  I wonder then why the guidelines or the advisory

14   notes or the application notes for the murder guidelines say what

15   they say?  Because if the government's argument is correct, it

16   would appear to me that the comment regarding what the court

17   can do by way of a downward departure in a felony murder case

18   would be absolutely superfluous and meaningless and I don't

19   think the Sentencing Commission committed a meaningless act.

20   The government also indicates that the cross reference to the

21   application notes going to felony murder refer to certain species

22   or types of felony murder, but not kidnapping as being the

23   underlying felony.  We would disagree with that because this,

24   after all, as to Counts 2 and 3 is a felony murder case.

25        We would also say to the Court that we believe a downward

1    departure or variance can be applied in this case because in

2    this particular case life imprisonment is not a mandatory

3    minimum sentence.  It is a sentence.  Mr. Murphy was not eligible

4    for the death penalty because the Muscogee Creek Nation never

5    entered into a compact with the U.S. government that would

6    permit the death penalty to be imposed for an Indian Country

7    murder on the Muscogee Creek Nation.  So, in this instance, life

8    is not a mandatory minimum sentence, it is a sentence that we

9    believe the Court could depart downward from.  The death

10   penalty was not available in this case, so you can't really say

11   that life is a mandatory minimum sentence under the statute.

12        I think that to an extent the Probation Office agrees with us

13   because they did not adopt the argument of the government that

14   there is just no way the Court could impose a downward variance

15   in this case.  They recognize, I think, if I am reading it correctly,

16   that the Court can impose a sentence less than the level 43 they

17   found to apply based on the offense of conviction with the highest

18   punishment possibility, which they designate as Count 3,

19   kidnapping resulting in the death of George Jacobs.

20        So, Your Honor, just to summarize, and I will try to get

21   through this here within the next minute or so, we would ask

22   the Court to, number one, sentence Mr. Murphy to concurrent

23   terms of imprisonment, impose a downward departure or

24   variance with respect to Count 1 where the guideline range is

25   235 to 293 months for Second Degree Murder, and also depart

1    downward as to Counts 2 and 3.  Again, this was not a case of

2    premeditated murder.  The jury rejected a First Degree

3    Premeditated Murder verdict.

4         This is not strictly relevant, I guess, and an appellate court

5    is going to have to decide this, but the kidnapping case against

6    Mr. Murphy, in our opinion anyway, is exceedingly weak.

7    I believe the government argued that they were able to fulfill

8    meeting their burden of proof because there was a thing of

9    value obtained from the homicide, mainly that Mr. Murphy got

10   bragging rights, that he could go around and say, hey, look what

11   I did.  That is not a thing of value in anybody's definition that I am

12   aware of and I haven't found any case that would indicate that.

13        Another mitigating circumstance, Your Honor, is that

14   Mr. Murphy spent two decades on death row at the Oklahoma

15   State Penitentiary on a conviction for which the State of

16   Oklahoma had absolutely no jurisdiction whatsoever to try him,

17   convict him and punish him.  And I think he has certainly

18   suffered a lot of stress, strain, and things of that nature from

19   being on death row for two decades when he shouldn't have

20   ever been there to begin with.  So he has already suffered a

21   tremendous punishment in that respect.

22        I don't think Mr. Murphy had a single disciplinary write-up

23   while he was on death row at the Oklahoma State Penitentiary.

24   He has no history of violence before this particular case.  His

25   prior criminal history is minimal.  He had a misdemeanor DUI

1   conviction in 1997, and there was a Driving Under Suspension

2   case that was dismissed, I think, after Mr. Murphy was arrested

3   for First Degree Murder by the state in this matter.

4        Mr. Murphy, as the state court decision reflected, is

5   intellectually challenged.   He had a mental retardation trial in

6   state court while he was on death row.  The jury found that he

7   was not mentally retarded.  However, there was sufficient evidence

8   of intellectual deficits for that matter to be submitted to a jury.

9        So, Your Honor, we would ask the Court, to the extent it

10  believes it is empowered to do so, to depart downward on

11  whatever sentence it imposes.  We believe the Court can do that

12  under the unique circumstances of this case with respect to both

13  Counts 2 and 3.  And we would also ask the Court, of course, as

14  I've said I think a couple of times, to run the sentences for

15  Counts 1, 2, and 3 concurrently with credit for time served.

16  The credit for time served being that Mr. Murphy has been in

17  the custody of somebody, the state or the federal government,

18  since August the 29th, 1999.  That is coming up on 23 years.

19  So we would ask the Court, in whatever sentence is imposed,

20  to give him credit for time served.

21       Thank you.

22       THE COURT:  All right.  Mr. Autry, thank you.

23       All right.  Mr. Leaman, would you like to respond?

24       MR. LEAMAN:  Your Honor,  very, very briefly, the

25  United States' sentencing position is represented in its

1    Sentencing Memorandum.

2         The downward variance, downward departure request by

3    the Defendant is simply unsupported by the law.  With respect,

4    Your Honor, the Court does not have the power to depart below

5    the mandatory life sentence in this case.

6         Having said that, Your Honor, I am happy to answer any

7    questions you have.

8         THE COURT:  Okay.  I think I am good.

9         MR. LEAMAN:  Thank you, sir.

10        THE COURT:  There appear to be two substantive

11   objections by the Defendant to the Final Presentence Report that

12   remain outstanding.  For purposes of this hearing, the Court will

13   address the Defendant's objection to the information contained

14   in the offense conduct as Objection Number 1 and the

15   Defendant's objection to the guideline calculations as Objection

16   Number 2.  Further, contained within defense counsel's

17   objections he cites various factors that he deems warrant a

18   downward variance or departure in this case.  I will rule

19   separately on the Motion for Departure and/or Variance.

20        Counsel for the Defendant objects to certain statements

21   contained in the Offense Conduct Section of the Presentence

22   Report.  Counsel concedes these statements were contained in

23   the discovery material and were presented during the trial in

24   this case; however, he wishes to preserve the objections for

25   future appeal purposes.  I have, of course, heard the evidence

1    myself.

2        The Offense Conduct section of the report is a narrative of

3    the information garnered from the discovery materials provided

4    by the Government coupled with the evidence presented at trial.

5    The information contained in the Presentence Report is

6    supported by that information and as by the evidence heard by

7    the Court at trial.  Therefore, the Court finds that the Offense

8    Conduct section is accurate.  The Defendant's objection Number 1

9    is overruled.

10        Counsel for the Defendant also objects to the guideline

11    calculations contained in the Presentence Report.  Counsel

12    reiterated his argument from his Rule 29 Motion that the

13    evidence was lacking to prove kidnapping.  Further, counsel

14    states that the "guiding count for determining punishment" should

15    be Murder in the Second Degree, not Count 3 as reflected in the

16    Presentence Report.

17        The Defendant was found guilty of Kidnapping Resulting in

18    Death, in violation of 18 United States Code Section 1201(a)(2).

19    This statute specified that if the death of any person results, the

20    person shall be punished by death or life imprisonment.  Further,

21    as detailed in the Final Presentence Report, the guideline for a

22    violation of 18 United States Code Section 1201(a)(2) is found

23    in Guideline Section 2A4.1.  Pursuant to the cross reference at

24    Guideline Section 2A4.1(c)(1), if the victim was killed under

25    circumstances that would constitute murder under 18 United States

1     Code Section 1111, you apply Sentencing Guideline Section

2     2A1.1.  In this case, the Defendant clearly killed the victim under

3     circumstances that would constitute murder under 18 United States

4     Code Section 1111.  This cross reference does not require that

5     the murder be committed with an element of premeditation, simply

6     that the kidnaped victim was murdered.  Therefore, the guideline

7     calculation contained in the Final Presentence Report is accurate

8     and the Defendant's objection is overruled.

9          Defense counsel has also filed a Motion for Downward

10    Departure and a Motion for Sentencing Variance requesting a

11    sentence within the sentencing range called for by an offense

12    level of 38, which is 235 to 293 months imprisonment.  Counsel

13    requests a downward departure and variance pursuant to

14    various factors cited in Section 3553(a), including the nature

15    and circumstances of the offense and the history and characteristics

16    of the Defendant, the kinds of sentences available, and the need

17    to avoid unwarranted sentencing disparities.

18         With regard to the nature and circumstances of the offense

19    in this case, the Court finds that the guidelines take into account

20    the crime charged.  The Court has also considered the

21    Defendant's personal history and characteristics, in addition to

22    the other factors cited in 18 United States Code Section 3553(a).

23    The Court has reviewed the Defendant's motions and has taken

24    into consideration the government's position in this matter.  I've

25    also considered the statutory minimum sentence in this case.

12

1          In establishing an appropriate sentence for this Defendant,

2    I've considered the totality of the circumstances regarding the

3    offense of conviction and the Defendant's conduct during the

4    crime, in addition to the testimony heard at the trial in this case.

5    I recognize my authority to depart and/or vary from the

6    advisory sentencing range called for by the application of the

7    guidelines.  Taking into consideration the Defendant's history

8    and characteristics, including his criminal history, childhood

9    experiences, as well as the offense conduct, the need for just

10   punishment, deterrence and protection of the public, the Court

11   cannot find that the circumstances in this case warrant a

12   departure or variance.  Therefore, the Defendant's Motion for

13   Departure and Variance is denied.

14          All right.  Mr. Leaman, I am going to give you an opportunity

15   to advance the government's arguments in aggravation or

16   mitigation of punishment, and also you can present your victim

17   evidence at that time.

18          MR. LEAMAN:  Thank you, Your Honor.

19          THE COURT:  The Presentence Report will form the

20   factual basis of the Court's sentence today.

21          You can continue.

22          MR. LEAMAN:  Thank you, Your Honor.

23          Your Honor, the United States is asking for a life sentence

24   in this case, which is supported by the PSR, as well as the

25   statutory minimum sentences in this case.

1          Your Honor, at this time, with the Court's permission,

2   I would like to read two victim impact statements.

3          THE COURT:  Yes.

4          MR. LEAMAN:  Thank you, sir.  Your Honor, this victim

5   impact statement is from Irene Jacobs.

6          "My name is Irene Jacobs.  On August 28th, 1999, my brother,

7   George Jacobs, was beat, kicked and cut with a knife and left to

8   die on the side of the road in Vernon, Oklahoma.

9          Like any family, we celebrated family birthdays and holiday

10  celebrations with all the Jacobs' family members.  Now George

11  has missed all these because his life was taken.

12         George was the family mechanic.  He liked to tell jokes.  One

13  time he told my niece Cary he was going to be famous, but I am

14  sure he didn't mean it by his life being taken.

15         When George was murdered everything seemed not real.

16  You read, hear about cases like this on TV, but not your family.

17  I still remember George's appearance from being beaten.  That

18  does not ever go away.  You just replace it in your mind with

19  better memories of George and know that he is okay now and

20  how he must have suffered from the brutal beating.

21         Life is not as carefree as it was, yet you still move forward.

22  I have come to court to show my support for George Jacobs, to

23  say he is important and had a right to be here alive today.  And

24  the court proceedings have always been about justice for the

25  crime committed.  It does not matter what the land was called,

1    state or Creek land.  That being said, the request of the family of

2    George Jacobs is that Patrick Murphy be kept incarcerated and

3    be given the maximum sentence penalty for the crime he committed."

4        Your Honor, the second victim impact statement is from

5    Megan Nicole Jacobs.

6        "Hello.  My name is Megan Nicole Jacobs.  I am the daughter

7    of George Jacobs.  I read a quote once that said, 'Some of us

8    matured early because life showed us the worst side of the world

9    at an early age.'  I find this to be true.  I had to grow up at a young

10   age.  I also had to learn to deal with my emotions during this time

11   as well, being a nine-year-old girl whose father was brutally taken

12   from her by a heinous crime that was fueled by rage motivated by

13   jealousy.  It is hard for me to get into that mind space to talk

14   about how my father, George Jacobs' death affected me, but let

15   me try.

16       I chose to live with my dad because Patrick used to beat my

17   mom.  I could hear her screaming and crying from the next room

18   and I was never allowed to go into the room.  His mom always

19   stopped me and told me to go outside.  There were times when

20   my mother wasn't even let out of the room because he was so

21   controlling.  There would be times when I wouldn't get to see my

22   dad because he would accuse my mom of wanting to be with

23   him.

24       The weekend my father, George Jacobs, was murdered is

25   something I will not forget.  I went from spending time with my

mom and sister, going to the baby beauty pageant for my niece to

waking up from a dream of my dad dropping me off with my mom

and not telling me goodbye or I love you.  I knew what this dream

meant, it meant that he was gone and not coming back.  That night

when I woke up and got out of bed and walked down the hall to the

kitchen, I could hear my mom crying.  When she seen me, she told

me to go back to bed.  I told her I wanted to go home; I wanted my

dad.  I looked from her red swollen eyes to his and the look in

Patrick's eyes that night made me want to run.  I did not want to

be there anymore.  All I wanted was to go home and to see and

to be with my dad.  She walked me back to the door, put me back

in bed and shut the door behind  her.

  The next day when we came from Okmulgee heading back

to my sister's house, I remember seeing the trailer that we used

to stay in surrounded by police.  I told my mom, 'Look at all of the

police.  What is going on?'  She was trying not to cry in front of

me at the time because I was still clueless about what happened.

I remember walking into the house, seeing everyone there, and

not knowing what was going on.  So I went back outside where

my mom, sisters and my aunts were.  They were all crying, so I

knew something wasn't right.  My Aunt Nadine told me to walk

with her.  She wanted to talk to me.  She had her arms in mine

as we walked down the driveway.  Once we got far enough away,

she turned me towards her, told me that my dad would not be

coming back anymore.  I asked why and she told me, 'Because

1    he has been killed.'  Once I heard that, I fainted.  My vision went

2    black and my head fell back.  I was out of it.  My aunt had to grab

3    ahold of me so I wouldn't fall to the ground.  Once I came back

4    around I was angry.  All I wanted to do was ride my bike down to

5    the trailer to hurt Patrick myself.  He took my dad away from me.

6    I was so angry at him and hurt that my heart was torn into pieces.

7    I wasn't sure what to do or what would happen because all I

8    wanted was to live with my dad still and have him with me like I

9    always did.

10         Having to deal with this trauma as a nine-year-old girl

11   messed my life up severely.  I changed schools so many times.

12   I was almost hospitalized for not talking.  I went through one

13   counselor after another.  I got tired of telling people my story.

14   It only made me more sad and angry because I had to tell

15   someone new every time about everything and how I was

16   feeling.  Eventually I was placed in CREOKS to help deal with

17   my depression.  It helped for a little bit, but everything went

18   crashing down when I lost my Uncle Homer four months after

19   losing my dad.  I started to feel like I was the problem.  Every

20   time I get close to someone they die.  Maybe if I had stayed

21   with my dad that night he would still be alive.  I dealt with the guilt of

22   his death for so many years it only made me depressed worse.

23         We moved from Arizona for a fresh start – I am sorry.  We

24   moved to Arizona for a fresh start,  but even that was hard for

25   me.  I had a hard time in school with making friends.  I got

1  picked on for being light-skinned, told I wasn't a real Native

2  American, I needed to go back to where I came from.  I fell

3  hard into depression.  I did not want to be here anymore.

4  I just wanted to die so that I could be with my father George

5  Jacobs.

6          I received a birthday card once from Patrick.  He wrote,

7  'Love always, Dad.'  He had called at that time and wanted to

8  talk to me.  I hung up the phone and got my mom.  This is where

9  everything started to spiral out of control for me.  I started

10  cutting my wrist.  I was so numb I needed to feel the pain.  It was

11  enjoyable.  I knew I was still alive, even if my life seemed

12  meaningless at the time.  Cutting  helped me a lot.  It was a

13  release for me when I couldn't get anything out, nobody to

14  talk to, and I felt like me and my mother were enemies at the

15  time.  I hated her, I hated myself.  My world was ugly.  My mind

16  was unstable.  I was having nightmares of Patrick coming to

17  kill us like he said he would.  I had nightmares of him tracking us

18  down and killing my mom with me not being able to do anything

19  about it.  I have had nightmares of going to court with him being

20  released from prison and causing me to live in fear and constantly

21  looking up the correctional facility to make sure he was still in

22  prison.

23          I started drinking and doing drugs at a young age.  Heavy

24  metal music became my therapy.  It keeps me calm, helps me

25  settle down my inner demons.  Honestly I was out of control.

My mother had to move us back to Oklahoma once again.  I was

upset and angry because I was being taken away from what

friends I had.  I was failing school, barely passed into the eighth

grade.  I wanted to be alone, away from everyone.  I begged my

mother to send me to boarding school.  I loved it, made a lot of

friends, went to a lot of places.

At sixteen I got pregnant with my first son.  I was so happy to

have someone of my own, but also sad because my dad wasn't

there.  After having my son, every day until now, I always think of

my dad.  I will always wonder if he would spoil my kids rotten, if

he would be proud of me or disappointed in me.

I spent years digging my way out of depression and guilt.

I learned how to turn my emotions off.  It scares me sometimes

how cold I can be, but this trauma did that to me.  It has

conditioned me to be cold, to be on guard with feelings and

relationships.  The trauma has shown me the signs of jealousy

that I won't deal with and the abuse I've also went through

because I thought that was okay in a relationship.  I realize

that my mother and I have walked side-by-side this entire

journey and along the way I have wandered off the path and

went through some of the same emotional, physical, and mental

abuse that she has went through.  The only difference is my

dad's murder has broken everyone, including me, but it is what

made me.  I decided a long time ago that I won't let my fear of

Patrick rule my life anymore.  I won't continue to look over my

1    shoulder anymore because if I keep doing that, it means he

2    won and I refuse to let him win.

3        My father, George Jacobs deserves justice for the criminal

4    heinous act that he had to endure.  We, as a family, want the

5    full maximum sentence that Patrick deserves.  I personally want

6    him to be sent to prison for the rest of his life since death is no

7    longer an option.  I would like to live my life in peace knowing I

8    won't have to be worried about him being released ever again."

9        Your Honor, those are the two victim impact statements

10   in this case.  I am happy to answer any questions the Court may

11   have about the United States' sentencing position.

12            THE COURT:  I have no questions, Mr. Leaman, other

13   than if you have anything else that you want to add just

14   sue sponte.

15            MR. LEAMAN:  No, sir.

16            THE COURT:  I  understand there is a Notice of Dismissal

17   of the original indictment; is that correct?

18            MR. LEAMAN:  Yes, Your Honor.

19            THE COURT:  All right.  The Court will execute that at

20   this time.

21        Okay.  Mr. Autry, you can approach with Mr. Murphy.

22                        (COMPLIED)

23            THE COURT:  All right.  Mr. Autry, anything you would

24   like to say further on behalf of your client?

25            MR. AUTRY:  No, Your Honor.  We did point to

1   some mitigating circumstances in our objections to the

2   Presentence Report and our Sentencing Memorandum.  We

3   would just re-urge those.  I've already discussed them.  And I

4   still think it is significant in this case that Mr. Murphy was

5   acquitted of the top chart, First Degree Premeditated Murder.

6   And from my standpoint anyway, I think it is still unclear, based

7   on the testimony the Court heard, what it was exactly that

8   Mr. Murphy did during this admittedly horrible and terrible

9   incident.

10          THE COURT:  All right.  Thank you, Mr. Autry.

11      Okay.  Mr. Murphy, this is your opportunity to address the

12   Court  before sentencing.  Is there anything you would like to say,

13   sir?

14          THE DEFENDANT:  No, Your Honor, I don't.

15          THE COURT:  Thank you.

16      Patrick Dwayne Murphy, you appear before the Court today

17   for the purpose of sentencing, having previously been found guilty

18   of Count 1 – Murder in  the Second Degree in Indian Country

19   in violation of 18 United States Code Sections 1111(b), 2, 1151, and

20   1153, Count 2 – Murder in Indian Country in Perpetration of

21   Kidnapping in violation of 18 United States Code Sections 111(a),

22   2, 1151, and 1153, and Count 3 – Kidnapping Resulting in Death

23   in violation of 18 United States Code Sections 1201(a)(2), 2,

24   1151, and 1153.  In accordance with Title 18, Section 3353(a)

25   of the United States Criminal Code, it is the judgment of this

1   Court that you are hereby committed to the custody of the Bureau

2   of Prisons to be imprisoned on Counts 1, 2, and 3 for a term of life.

3   All counts shall run concurrently.

4       If ever released from confinement, you shall be placed on

5   supervised release for a term of 5 years on Counts 1, 2, and 3.

6   All Counts shall run concurrently.  Within 72 hours following your

7   release from the custody of the Bureau of Prisons, you shall report

8   in person to the Probation Office in the District to which you are

9   released.

10       While on supervised release, you shall not commit another

11   federal, state, or local crime, shall not possess any illegal

12   controlled substance, shall not possess a firearm or destructive

13   device and shall also comply with the standard conditions as set

14   out in the Judgment, which are imposed because they establish

15   the  basic expectations for your behavior while on supervision

16   and identify the minimum tools needed by probation officers to

17   keep informed about, report to the court about, and bring about

18   improvements in your conduct and condition.  As a condition

19   of supervised release, you shall refrain from the unlawful use

20   of controlled substances and submit to one drug test within 15

21   days of your release.  Subsequent to the first test, you shall

22   submit to at least two additional periodic drug tests thereafter

23   not to exceed eight drug tests per month.  You shall submit to

24   DNA testing as directed by the United States Probation Office.

25   Based on the information provided in the Presentence Report

regarding the nature of the instant offense, you shall also comply

with the following special conditions of supervised release:

(1)  You shall participate in a program approved by the United

States Probation Office for the treatment of narcotic addiction,

drug dependency, or alcohol dependency, which will include

testing to determine if you have reverted to the use of drugs

or alcohol and this may include outpatient treatment.

(2)  You shall submit to a search conducted by a United

States Probation Officer of your person, residence, vehicle,

office and/or business at a reasonable time and in a

reasonable manner, based upon reasonable suspicion of

contraband or evidence of a violation of a condition of

release.  Failure to submit to a search may be grounds for

revocation.

It is further ordered that you shall pay to the United States a

Special Assessment of $100.00 on Counts 1, 2, and 3 for a

total of $300.00.  The assessment shall be paid through the

office of the United States Court Clerk for the Eastern District of

Oklahoma, and is due immediately.

Payment of a fine will not be imposed based upon your

current financial profile and the uncertainty of your projected

earning ability.

In formulating the sentence imposed, this Court has

considered the nature and circumstances of the offense as well

as the characteristics and criminal history of the Defendant.  The

1    Court has further taken into consideration the sentencing

2    guideline calculations contained within the Presentence Report

3    in addition to any objections, clarifications, additions or deletions

4    to those guideline calculations identified in the addendum to the

5    report or announced in open Court today.  While the Court recognizes

6    that it is not  bound by the sentencing guideline calculations, the

7    Court has considered them and find them to be advisory in nature.

8         The sentence prescribed by this Court reflects the seriousness

9    of the offense, promotes respect for the law and provides just

10   punishment for the offense.  This sentence affords adequate

11   deterrence to criminal conduct, protects the public from further

12   crimes of this Defendant and provides correctional treatment for

13   the Defendant in the most effective manner.  The Court has

14   further determined that this sentence is reasonable and sufficient

15   but not greater than necessary to meet the requirements and

16   objectives set forth in 18 United States Code Section 3553(a).

17   The Court notes for the record that, based upon all presently

18   known legal and factual factors, this is the same sentence the

19   Court would impose if given the broadest possible discretion and

20   the same sentence the Court would impose notwithstanding any

21   judicial fact finding occurring by adoption of the Presentence

22   Report or at this hearing.

23        I recommend that the Bureau of Prisons evaluate and

24   determine if the Defendant should be given credit towards his

25   sentence for any time previously served in custody and further

1    award the Defendant credit for such time served in accordance with

2    Bureau of Prisons' policy.

3              Okay.  Mr. Murphy, you have 14 days to appeal your

4    sentence.  Mr. Autry will remain your attorney during that time.

5         Anything further from the government, Mr. Leaman?

6              MR. LEAMAN:  No, Your Honor.

7              THE COURT:  Mr. Autry?

8              MR. AUTRY:  No, Your Honor.

9              THE COURT:  Mr. Murphy?

10             THE DEFENDANT:  No, nothing.

11             THE COURT:  You are remanded to the custody of the

12    Marshal, sir.

13                    (END OF PROCEEDINGS)

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2          I, Karla McWhorter, Certified Shorthand Reporter and

3    Registered Professional Reporter, do hereby certify that the foregoing

4    is a true and accurate transcription of my stenographic notes and is a

5    true record of the proceedings held in the above captioned case.

6          I further certify that I am not employed by nor related to any

7    party in this action, and that I am in no way interested in the outcome

8    of this matter.

9          Certified on this 17th day of July 2022.

10

11

12          /s/KARLA McWHORTER

13          Karla McWhorter, CSR-RPR

14          United States Court Reporter

15          918-684-7936

16          karla_mcwhorter@oked.uscourts.gov

17

18

19

20

21

22

23

24

25